

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-17-00026-CV

Michele R. **PAULI** and Alann Torres,
Appellants

v.

Michael D. **HAYES** and Teresa C. Hayes,
Appellees

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2012-CI-12272
Honorable Solomon Casseb, III, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:       Patricia O. Alvarez, Justice
               Luz Elena D. Chapa, Justice
               Irene Rios, Justice

Delivered and Filed:  July 18, 2018

AFFIRMED IN PART, REVERSED AND RENDERED IN PART, REVERSED AND
REMANDED IN PART

This is a dispute between neighbors about a sports court appellants built in their back yard.

After more than five years of litigation, a jury rendered a verdict partially favorable to Michael

and Teresa Hayes. Based on the verdict, the trial court signed a judgment awarding the Hayeses

damages for loss of market value of their property, loss of use and enjoyment of their property,

and trespass. The trial court also granted injunctive relief and denied Michele Pauli's and Alann

Torres's request for attorney's fees for prevailing on a Water Code claim. Pauli and Torres appeal,

raising numerous challenges to each disposition in the judgment. For the reasons discussed below,

we affirm the damage awards on the trespass and negligence claims and affirm the denial of an award of attorney's fees. We reverse and render the award of damages for loss of market value because the evidence is legally insufficient to support the award. We reverse and render the parts of the injunctive relief that are not supported by the pleadings and evidence or that are overly broad. We reverse the part of the injunctive relief that requires shielding of the lights and installation of black-out banners because it is insufficiently specific, and we remand the case to the trial court to render injunctive relief that is definite, clear, and precise.

## BACKGROUND

Appellant Michele Pauli bought a home in 2011. The back property line is adjacent to the back property line of Teresa and Michael Hayes ("the Hayeses"). Pauli and her husband, Alann Torres, ("the Torreses") built additions to the house and then built a 75 foot by 126 foot sports court in their back yard. One side of the court runs parallel to the Hayeses' back property line, and the edge of the court is approximately two-to-three feet from the property line. Because the Torreses' and Hayeses' back yards slope from one side to the other, the slab of the court along the Hayes property line is increasingly high against the grade, and a part of the court along several feet of the back property line is raised about six feet above the natural grade. The Torreses installed eight light poles on the court that are each twenty feet tall. Each pole has two light fixtures and each fixture has a one thousand watt lamp. In addition, the Torreses began installing a sports court fence to keep tennis balls from going onto the Hayes property. However, the fence was removed after the Hayeses complained it violated the City Code. The Torreses proposed various types of screens, fencing, netting, or backstops to contain tennis balls and to help provide privacy, but the Hayeses refused to agree to any of the proposals and objected to the Torreses' requests for variances. Consequently, the Torreses placed large planters of bamboo between the edge of the sports court and the property line, in hopes that as the bamboo grew taller, some of the Hayeses

concerns would be resolved. At the time of trial, the bamboo was between eight and twelve feet tall. The Hayeses also complain that the sports court, retaining wall, and bamboo planters have altered drainage patterns and diverted water onto their property.

The Hayeses filed their original petition and application for a temporary injunction in July 2012. They alleged negligence per se and private nuisance, sought a declaratory judgment that the sports court was in violation of the City's Unified Development Code, and sought injunctive relief to require a large part of the sports court and lighting be removed. The trial court granted a temporary injunction, precluding use of the lights and the court. As a result, the Torreses did not use the sports court or turn on the lights, except for testing purposes, from August 2012 until April 2015, when the temporary injunction was declared void.

In November 2015, the trial court dismissed all the Hayeses' claims based on alleged violations of the City's Uniform Development Code or the International Building Code, including their claims for declaratory judgment and negligence per se, and their allegations of public and private nuisance based upon alleged code violations. The Hayeses' declaratory judgment action for violation of the Water Code was not dismissed and the court allowed the Hayeses to replead a private nuisance based on other facts. In connection with these rulings, the trial court awarded the Torreses $19,998.50 in attorney's fees for prevailing on the claims under the Declaratory Judgment Act. Then, in September 2016, the trial court granted the Torreses' motion for summary judgment on the Hayeses' causes of action for tortious interference with the use and enjoyment of property and tortious interference with prospective business relationship.

The case went to trial in October 2016 on the Hayeses' Fifth Amended Petition. The Hayeses complained about the design and construction of the sports court, focusing on the court's proximity to the property line and the slab's height at one end, the lighting design and installation, and the drainage system design that allegedly diverted water to the Hayeses' property. They

submitted the case to the jury on five theories: nuisance, trespass, invasion of privacy, negligence, and violation of the Texas Water Code. The Hayeses asked the jury to award them over three million dollars for loss of market value, cost of remediation, loss of use and enjoyment of their property, and mental anguish, and further sought punitive damages and attorney's fees. The jury found that the Torreses negligently caused a nuisance and were strictly liable for causing a nuisance, and that the nuisance resulted in a $25,000 loss in the market value of the Hayeses' property. The jury also found that the Torreses committed trespass, but found the Hayeses did not suffer any actual damages as a result of the trespass and awarded $5,000 as nominal damages. The jury found both the Hayeses and the Torreses were negligent, the Torreses were 77% responsible, and the negligence caused $2,500 in past loss of use and enjoyment of the property. The jury found against the Hayeses on their claims for intentional nuisance, invasion of privacy, violation of the Texas Water Code, and gross negligence. Finally, the jury found the Torreses' attorney's fees incurred in connection with the Water Code claim are $161,480.44.

After hearing post-judgment motions, the trial court disregarded the jury's finding of attorney's fees incurred by the Torreses. The trial court rendered a final judgment awarding the Hayeses $25,000 for loss of market value of their property caused by the nuisance, $5,000 in nominal damages for trespass, and $1,925 (77% of $ 2,500) on the negligence claim. It denied relief to the Hayeses on their Water Code claim and to the Torreses on their claim for fees. The court awarded the Hayeses prejudgment interest and credited the judgment for the previous award of attorney's fees to the Torreses. In addition, the trial court granted the Hayeses injunctive relief.

The Torreses appeal, complaining of the nuisance and negligence liability findings, each of the damage awards, the failure to award them their attorney's fees under the Water Code, and raising a number of complaints about the injunctive relief.

**ATTORNEY'S FEES UNDER THE WATER CODE**

The Hayeses alleged the Torreses violated section 11.086 of the Texas Water Code, which provides that "[n]o person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded." TEX. WATER CODE ANN. § 11.086(a) (West 2008). The Hayeses sought damages and attorney's fees for the violation. In their answer, the Torreses sought to recover their attorney's fees pursuant to section 11.0841 of the Texas Water Code. *See id.* §11.0841(b).

Over the Torreses' objection, the trial court submitted a question to the jury asking whether the Torreses violated section 11.086 in a manner that injured the Hayeses' property. The court also submitted questions asking the jury to find the reasonable attorney's fees incurred by each party in connection with the claimed Water Code violations. The jury found the Torreses did not violate the Water Code and found they incurred reasonable attorney's fees in the amount of $161,480.44 in defending the claim. The Hayeses then filed a motion to disregard the attorney's fees finding, arguing to the trial court that the finding was immaterial and should be disregarded as a matter of law because the Water Code does not authorize the Torreses to recover fees. The trial court agreed and did not award the Torreses their fees. They claim this was error.

By granting the motion to disregard, the trial court determined the finding was immaterial. A finding is immaterial if it should not have been submitted. *See Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). Whether attorney's fees are available under a statute is a question of law we review de novo. *Fitzgerald v. Schroeder Ventures II, LLC*, 345 S.W.3d 624, 627 (Tex. App.—San Antonio 2011, no pet.).

The parties agree that section 11.086 of the Water Code does not authorize an award of fees, but the Torreses contend a fee award is authorized by section 11.841(b). That section of the Water Code provides:

> (b) A district court may award the costs of litigation, including reasonable attorney fees and expert costs, to any political subdivision of the state, private corporation, or individual that is a water right holder and that prevails in a suit for injunctive relief to redress an unauthorized diversion, impoundment, or use of surface water in violation of this chapter or a rule adopted pursuant to this chapter.

TEX. WATER CODE ANN. § 11.841(b). Under the plain language of the statute, prevailing individuals may recover fees only if they are "a water right holder." *Id.* Section 11.002(5) of the Water Code provides that for the purpose of Chapter 11 of the Water Code, a "water right" is "a right acquired under the laws of this state to impound, divert, or use state water." TEX. WATER CODE ANN. § 11.002(5) (West Supp. 2017). The Torreses did not plead or present any evidence that they are holders of a "water right," and they provide no argument as to how they are holders of a "water right" such that they would be entitled to a fee award under section 11.841(b). Moreover, section 11.841(b) provides the trial court a degree of discretion in determining whether to award fees by stating that the "district court may award" costs and fees. *See* TEX. GOV'T CODE ANN. § 311.016(1) (West 2013); *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998). Even if fees may be awarded for prevailing on the claim in this case, the Torreses do not provide any argument as to how that discretion was abused. We hold the trial court did not err by failing to award the Torreses their attorney's fees.

### AWARD OF "NOMINAL" DAMAGES FOR TRESPASS

The jury found the Torreses trespassed on the Hayeses' property. It further found the Hayeses did not suffer any actual damages, but awarded them $5,000 in "nominal" damages. The Torreses did not complain about the nominal damages finding in any post-verdict motion, and the trial court awarded those damages in the judgment. On appeal, the Torreses do not argue the

evidence is insufficient to support the finding of trespass, but contend the award must be reversed because $5,000 is not nominal as a matter of law. *See MBM Fin. Corp. v. Woodlands Op. Co.*, 292 S.W.3d 660, 665 (Tex. 2009) (holding that $1,000 is not nominal as a matter of law).

Generally, as "a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion." TEX. R. APP. P. 33.1(a)(1)(A). This rule "conserves judicial resources and promotes fairness by ensuring that a party does not neglect a complaint at trial and raise it for the first time on appeal." *Burbage v. Burbage*, 447 S.W.3d 249, 258 (Tex. 2014). The record does not reflect the Torreses presented this complaint to the trial court. Accordingly, they did not preserve the error for review. We therefore affirm the award of $5,000 for trespass.

## DAMAGES FOR LOSS OF MARKET VALUE

The judgment awarded the Hayeses $25,000 for loss of market value proximately caused by an "abnormal and out of place" nuisance. The Torreses argue the evidence is legally insufficient to support the damage award.[1]

The evidence at trial on this issue was the testimony of Michael Hayes and of the Hayeses' expert appraiser, Don Canaday, both of whom testified the Hayeses' property value had been reduced by twenty percent because of the lighting, drainage, and privacy issues caused by the Torreses' sports court. The Torreses argue the witnesses failed to provide any factual support for their conclusion, making the conclusions speculative and of no evidentiary value. We agree.

Proof of lost market value resulting from a nuisance ordinarily requires a comparison of market value with and without the nuisance. *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d

---

[1] The Torreses also argue the evidence is insufficient to support the jury's finding of "abnormal and out of place", or strict liability nuisance. Because we hold there is legally insufficient evidence to support the damage award, we do not reach this issue.

150, 155 (Tex. 2012). The witness's testimony about value must be based on market, not some speculative value, and the witness must explain the basis for his opinion. *Id.* at 155-56. To prove lost value, an expert witness must bring more than his credentials and a subjective opinion. *Id.* at 156. The expert must provide "reasonably certain evidence," which "must be based on objective facts, figures, or data" and provide an explanation of how the objective facts support the conclusion. *Id.* at 157. "An expert's testimony is conclusory as a matter of law if he 'simply state[s] a conclusion without any explanation.'" *Id.* at 156 (quoting *Arkoma Basin Expl. Co. v. FMF Assocs. 1900-A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008)). An expert's bare conclusions, even if not objected to at trial, will not support a judgment. *Id.* at 156 (citing *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 231-32 (Tex. 2004)).

A property owner is qualified to testify about the value and loss of value of his own property; however, his opinion testimony is subject to the same requirements as any other opinion evidence. *Id.* 397 S.W.3d at 155-56. Thus, an owner's opinions about property value must be based on market, rather than on some other speculative value of the property and the evidence must reflect a sufficient basis for the opinion. *Id.* at 155-57, 159. "An owner may not simply echo the phrase 'market value' and state a number to substantiate his diminished value claim; he must provide the factual basis on which his opinion rests." *Id.* at 159. As with an expert's testimony, conclusory, unsubstantiated testimony about value will not support a verdict, even if the testimony is unchallenged. *Id.*

The Hayeses' expert, Don Canaday, has been a real estate appraiser for over forty years and has experience appraising properties with problems or defects. He testified at trial and his written report was admitted into evidence. Canaday first appraised the property, not considering the existence of the tennis court. Using the sales-comparison approach, Canaday appraised the property's unimpaired market value at $510,000. The Torreses do not challenge that appraisal.

- 8 -

Canaday then sought to determine the impaired market value using a method similar to that used by the expert in *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820 (Tex. 2014).[2] Canaday testified he has spent many years studying properties that suffer from a market "stigma," which he stated occurs "when a serious problem has been found in, upon, or near a property, and the repair or remediation is expected to be or, if completed, was extensive." He testified his "studies are quite extensive" and that prospective buyers consistently "react negatively and with suspicion." He referred to the resulting diminution in value as "stigma" and stated "[t]he stigma amount can be ascertained from actual sales of properties with these types of problems." He stated that "details of this market data is retained in [his] files and has been gathered over many years," and he concluded that "[t]he result of this market research is that the stigma amount ranges from about 5% to as much as 30% reduction in value."[3] Canaday testified the percentage of reduction within this range depends on the severity of the problem and how easy it is to cure. He stated that most of the properties in his studies involve defects within the property boundary that the owner has control over and can cure. However, five or six of the properties in his studies involve defects outside the property boundary that affect the value. One of these studies involved homes in a neighborhood that backed up to a fence separating them from a Target store parking lot. He testified that lighting and noise were an issue and that these homes were selling for less than houses that did not back up to the fence. He testified that he found "the reaction was the same as I had been finding for cases involving cracked slabs and defective construction." Canaday denied that the Torreses' sports court and the Target store are comparable; however, he testified

---

[2] In *Houston Unlimited*, rather than calculating the subject property's impaired value by comparing it to the values of other similar properties, the expert reduced the property's unimpaired value by a percentage based on the diminution percentages she had found for other properties that were purported to be similarly impaired. 443 S.W.3d at 830. The court stated it had found no authorities involving this percentage reduction method approach, but declined to hold it could never be used to reach a reliable opinion on diminution of value damages. *Id.*

[3] Mr. Canaday did not provide any evidence as to how he arrived at the five to thirty percent range.

that the light intrusion into the Hayeses' yard is "much like" the lights he saw in the yards of the people who lived next to the Target store.

For the purpose of his diminution in value analysis, Canaday assumed that: (1) the illumination from the lights on the sports court was sufficient to be a nuisance; (2) the sports court had changed drainage runoff patterns on the Hayes property, making it a nuisance; and (3) the design and construction of the court created a privacy issue because the players on the sports court have a clear view into the Hayeses' back yard and of the back of the house. Canaday stated these are "detrimental conditions" that would affect prospective buyers, and because the conditions are external to the Hayeses' property and not within their control, they would "constitute a perpetual stigma on their property." He testified that "[h]ere we have a situation where most of the defects are outside the property boundaries that the property owner has no control over that will remain. You have to assume they will, anyway. So I think the damage is within the upper end of that 5 to 30 percent range. That's how I chose 20 percent." He concluded "the diminution in value of the Hayes' property should be based on 20% of the 'as if good' value," or $102,000, plus the cost of any repairs needed to remediate damage from water diversion.

In *Houston Unlimited*, the expert sought to establish that the plaintiff's ranch suffered a reduction in market value because of environmental contamination caused by a nearby landowner. *Id.* at 829. The expert identified other properties she asserted were similarly impaired and "attempted to identify losses in market value that [those] sites suffered, calculated as percentages of the unimpaired value, and then opined that the ranch had likewise suffered a similar loss in its proportionate value. She thus calculated the ranch's impaired value not by comparing it to values of other similar properties but by reducing its unimpaired value by a percentage based on the diminution percentages she had found for the [other] sites." *Id.* at 830. After reviewing the evidence, the Texas Supreme Court concluded the expert's opinion was conclusory and without

evidentiary value. *Id.* at 838. The court identified three principal problems with the testimony: (1) the data the expert relied on regarding the other sites did not support her opinion that those properties lost market value; (2) the expert offered no evidence that any reduction in the value of the other sites was caused by market stigma instead of other market factors and merely assumed the diminution in market value was due to the nearby contamination; and (3) the expert failed to account for any differences between the ranch and the other sites or any differences between the nature of the contamination of the three properties. *Id.* at 830.

Canaday provided less information and explanation to support his conclusion than did the expert in *Houston Unlimited*. Canaday testified his opinion that the sports court reduces the value of the Hayeses' property by twenty percent is "absolutely" not "just a guess" and is "based on empirical data" he has collected. However, he did not provide any specific information about the data or the properties in his studies, either in his testimony or in his written report. He did not provide any explanation of how he concluded the properties in his database suffered reductions in value of between five and thirty percent or any explanation of how he concluded any reductions in value were caused by any particular defect. The only properties in his studies to which he specifically referred were the homes near a Target store. As to those, Canaday testified only generally that the houses next to the store were selling at prices lower than others in the neighborhood and that lights from the Target store shone into the yards. Canaday did not provide any information about how much less they sold for, how much market value they lost, or how he calculated the loss. Nor did he testify about other similarities or differences between the houses next to the Target store and the other houses that might account for differences in price, such as lot size or square footage of the homes. He did not provide any explanation as to how he determined any loss in market value was caused by light illumination from the Target store instead of other factors such being next to a parking lot or commercial business and the attendant traffic

noise. Finally, Canaday's testimony did not account for any differences between a property adjacent to a large, well-lit commercial parking lot and one adjacent to a well-lit private residential sports court.[4]

"[T]he evidentiary value of expert testimony is derived from its basis, not from the mere fact that the expert has said it." *Id.* at 829. "An expert must 'connect the data relied on and his or her opinion' and 'show how that data is valid support for the opinion reached.'" *Id.* at 835 (quoting *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 642 (Tex. 2009)). Thus, when "no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Id.* at 829 (quoting *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009)). Canaday testified that his opinion that the Torreses' sports court caused a twenty percent loss in the market value of the Hayeses' property is based on "empirical data" in his records on which he has done "extensive studies." However, Canaday's opinion is a "conclusion without explanation" because he did not provide any of the data he relied upon, explain the methodology of his studies, or explain how the data supports either the five-to-thirty percent range or the twenty percent reduction in value he asserted applies in this case. *See id.* at 837-38; *Justiss*, 397 S.W.3d at 161. We therefore hold Canaday's testimony is incompetent to support the award for past loss of market value.

The only other evidence of the lost market value was Michael Hayes's testimony. Hayes testified that he has "seen other houses with similar situations," and that his property is "probably devalued 20, 25 percent." He also testified that initially, before seeing the sports court lights on, it was his opinion that his property had been devalued "about $75,000." However, after seeing the

---

[4] Although Canaday testified the illumination of the Hayeses' yard was "much like" that created by the Target store, Canaday never saw the Hayeses' property when the sports court lights were on.

lights on, he believes the loss is between $125,000 and $135,000. Hayes did not base his opinions on market value and did not explain how he arrived at those figures. His opinion was speculative and unsubstantiated and does not support the verdict. *See Justiss*, 397 S.W.3d at 159, 161.

The evidence of loss of market value caused by the sports court is speculative and conclusory, and is legally insufficient to support the damage award. We therefore reverse the award of $25,000 for loss of market value and render judgment that the Hayeses' take nothing on their claim for lost market value.

### NEGLIGENCE, NUISANCE, AND DAMAGES FOR LOSS OF USE AND ENJOYMENT OF PROPERTY

The jury was asked two negligence questions. One generally asked whether the Torreses' failure to use ordinary care proximately caused injury to the Hayeses or their property. The other inquired whether the Torreses' failure to use ordinary care created a nuisance.[5] The jury was instructed that a nuisance was created if the Torreses' conduct caused unreasonable discomfort or annoyance to a person of ordinary sensibilities attempting to use and enjoy their land. The jury answered "yes" to both questions and assigned 77% responsibility for the resulting injury to the Torreses and 23% to the Hayeses. The jury found the Torreses' negligence proximately caused $2,500 in damages for past loss of use and enjoyment of the Hayeses' property. Based on these findings, the trial court awarded the Hayeses 77% of the damages found, or $1,975, and injunctive relief. On appeal the Torreses contend that a negligently created nuisance was not pled and there is legally and factually insufficient evidence of duty, breach, and nuisance.[6]

---

[5] The Torreses did not object to submission of both questions on the ground the claims were duplicative. *See Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 607, n.18 (Tex. 2016).

[6] The Torreses also assert that the damage award of $2,500 for loss of use and enjoyment violates the one-satisfaction rule, arguing that the Hayeses suffered a single injury and could not recover both lost market value and loss of use and enjoyment. *See Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 276 (Tex. 2004). Because we have reversed and rendered the award of lost market value, there is no basis to argue there is a double recovery and we do not reach that issue.

*Sufficiency of the Hayeses' pleading*

The Hayeses' live pleading asserted a claim under the heading "Negligence" that the Torreses failed to "exercise ordinary care in the modification, design, planning and construction of improvements on their property which has caused (and continues to cause) damages to Plaintiffs." Under the heading "Private Nuisance," the Hayeses alleged the Torreses substantially and unreasonably interfered with their use and enjoyment of their property. They alleged the use of the Torreses' property was abnormal and out of place with the surrounding properties, the Torreses' acts were intentional, the Torreses' acts were grossly negligent, and the Torreses "failed to meet the standard of care in designing and constructing the Sports Court and other improvements" by, among other things, "fail[ing] to make use of existing mitigation technology." Under the fair notice pleading standard, this court "looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896-97 (Tex. 2000). The petition gave fair notice to the Torreses that a negligently caused nuisance was being claimed.

*Sufficiency of the evidence*[7]

The evidence is legally insufficient to support a jury's finding when: (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In reviewing whether any evidence supports a finding, we consider the evidence in the light most favorable to the verdict. *BNSF Rwy. Co. v. Phillips*, 485 S.W.3d 908, 910 (2015) (per curiam). We must consider the

---

[7] The Torreses did not raise any claims of factual insufficiency in a motion for new trial or other post-verdict motion, and therefore did not preserve those claims for appeal. *See* TEX. R. CIV. P. 324(b)(2).

evidence favorable to the finding if a reasonable juror could and disregard evidence contrary to the finding unless a reasonable juror could not. *City of Keller*, 168 S.W.3d at 807, 827.

A property owner has a duty not to use his property in a way that injures another. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 591 (Tex. 2016). When breach of that duty substantially interferes with use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities, it has caused a nuisance. *Id.* at 600.

In their challenge to the sufficiency of the evidence to support duty and breach, the Torreses argue the record is deficient because the Hayeses did not produce expert testimony regarding the standard of care and breach in the design and construction of the sports court and its lighting. However, "[t]he duty that [the Torreses] owed to the [Hayeses] was the duty to do what a person of ordinary prudence in the same or similar circumstances would have done." *Id.* at 614. The jury did not need expert testimony to understand that duty or to determine whether the size, type, and location of the lighting the Torreses installed breached that duty. *See id.* (holding no expert testimony of standard of care or breach needed for jury to determine that pipeline company breached duty by building and operating compressor station in such a way that its noise was beyond reasonable levels).

The evidence shows that one side of the 126 foot long sports court runs along the Hayeses' property line behind the Hayeses' back yard, and the edge of the court is between two and three feet from the property line. Part of the court along the property line is built 6 feet above the natural grade and rises above the Hayeses' privacy fence. Alann Torres testified the only person he spoke to about the lighting was at the company from which he bought the lights. He did not consult with anyone regarding spillage of light onto neighboring properties. The Torreses installed eight light poles on the court, four of which were installed along the property line. The other four poles were installed on the opposite side of the court. Each pole is twenty feet tall and has two light fixtures.

The fixtures extend outward in a V shape from the top of the poles, and add another three feet to the height. Each of the sixteen fixtures has a one thousand watt lamp and each lamp puts out 110,000 lumens of light.

The Hayeses' lighting engineer testified and provided a report in which he concluded the design and layout of the lighting was deficient — the primary deficiency being the light spill from the fixtures. He testified that neither the layout of the poles nor the configuration of the fixtures on the poles was standard for a recreational, residential court. He testified that a proper design would have had only four lights along the property line and the fixtures would have been installed perpendicular to the edge of the court so that the light was focused onto the court. Instead, the fixtures are angled, resulting in part of the light that should be directed onto the middle of the court being pushed to the side so it spills onto the property behind the poles and into the Hayeses' yard.

The expert and the Hayeses' lighting consultant observed the lighting at night and took measurements to see how much light was spilling over into the Hayeses' yard. They testified the lights illuminate in excess of fifty percent of the back yard and extends into the inside of the Hayeses' house. Numerous photographs, taken from various places on the Hayes property at night with the sports court lights turned on were admitted into evidence. They clearly depict intense light and glare, and one of the witnesses testified the lights appear brighter in real life than in the pictures. The witnesses measured the footcandles of light at various positions in the Hayeses' back yard at between one-fourth footcandle and twenty-eight footcandles. The lighting expert testified the spillage was "substantial and unacceptable," and the consultant testified that any spillage over one-tenth of a footcandle was not acceptable. The lighting consultant testified parts of the yard were as brightly lit as the courtroom, and that there was enough light spillage in the yard to read a newspaper at night. Both witnesses testified that shielding could hide the light source and reduce the amount of spillage. However, to reduce the spillage significantly, there should be only one

fixture per pole and it should be perpendicular to the edge of the court. The Torreses testified they had made some inquiries about available shielding after Mr. Hayes complained, but they did not install any shielding because they did not believe it would satisfy Mr. Hayes.

The Hayeses' lighting witnesses testified that the glare and the light spillage in the yard is "annoying," "irritating," and "obnoxious." Mr. Hayes testified that because the source of the light is visible from the yard, when one looks at them, it is blinding. He likened it to living next to a stadium. He also testified the lights shine into one of the rooms of his house so much that it appears more like daytime than night. Moreover, the jury was provided numerous pictures of the yard and the lights, taken at night, enabling the jurors to make their own determination as to whether the lights cause unreasonable discomfort or annoyance to a person of ordinary sensibilities attempting to use and enjoy the Hayeses' back yard.

Finally, the Torreses assert the lights could not have substantially interfered with the Hayeses' use and enjoyment of their property because the lights had rarely been used. During the pendency of most of the case, the Torreses were enjoined from turning on the lights. However, Mr. Torres testified that after the temporary injunction was dissolved, approximately fourteen months before trial, they had used the lights fifty-three times. This is sufficient use to allow the jury to make the findings it did.

We hold that more than a scintilla of evidence supports the jury's findings the Torreses were negligent and that their negligence created a nuisance. These findings support the trial court's awards of $1,975 for loss of use and enjoyment of the Hayeses' property and of injunctive relief.

INJUNCTIVE RELIEF

After the jury returned its verdict, the Hayeses moved for judgment and asked the court to award injunctive relief in addition to the damages found by the jury. In its final judgment, the trial court permanently enjoined:

(1) the Hayeses to build a six-to-eight foot tall privacy fence as allowed by the City Code at the property line, at a specified maximum cost to be split between the parties;

(2) the Torreses to build a sports court fence at least five feet from property line and in compliance with City Code, at a specified maximum cost to be split between the parties;

(3) the Torreses to remove the planters that are against the retaining wall;

(4) the Torreses to shield the sixteen lights currently in place and to install "black-out banners" on the four light poles adjacent to Hayes property; and

(5) the Torreses from playing tennis on the court or using the lights before 7:00 a.m. any time; after 7 p.m. weekdays and 9 p.m. weekends and holidays during Central Standard Time; and after 9 p.m. weekdays and 10 p.m. weekends and holidays during daylight savings time

In addition, paragraph (6) of the injunctive relief states that the "judgment shall inure to the benefit of the successors and assigns of the Hayes' property and shall be binding against the successors and assigns of Defendants' property" for "so long as the sports court made subject of the lawsuit remains."

The decision to abate a nuisance by means of an injunction is a discretionary decision for the judge after the jury has been discharged. *Schneider Nat. Carriers, Inc. v. Bates*, 147 S.W.3d 264, 286 (Tex. 2004). When the evidence shows the nuisance is recurring in nature and the plaintiffs will continue to experience the nuisance caused by the defendants' activities, the trial court may award permanent injunctive relief to afford complete relief. *Holubec v. Brandenberger*, 214 S.W.3d 650, 656 (Tex. App.—Austin 2006, no pet.). However, the injunction must be narrowly drawn and precise and "must not grant relief which is not prayed for nor be more comprehensive or restrictive than justified by the pleadings, the evidence, and the usages of equity." *Holubec v. Brandenberger*, 111 S.W.3d 32, 39-40 (Tex. 2003) (quoting 6 L. Hamilton Lowe, TEXAS PRACTICE: REMEDIES § 244, at 237 (2d ed. 1973)). We review the trial court's award of injunctive relief for abuse of discretion. *Operation Rescue-Nat'l v. Planned Parenthood*, 975 S.W.2d 546, 560 (Tex. 1998).

On appeal, the Torreses argue the injunctive relief awarded in the amended final judgment is not supported by the pleadings and the evidence, enjoins their lawful use of their property, is insufficiently definite and precise, violates Rule of Procedure 683, and impermissibly inures to the benefit of and binds non-parties.[8]

### *Is relief supported by pleadings and evidence?*

An applicant for an injunction must plead the relief sought, and a court abuses its discretion by granting relief beyond what is requested. *Hall v. Seal*, No. 04-09-00675-CV, 2011 WL 61631, at *4 (Tex. App.—San Antonio Jan. 5, 2011, pet. denied) (mem. op.). However, "[e]ven though a party requests special relief, if he also includes a prayer for general relief, he may be awarded the relief to which he is entitled under his pleadings and the evidence." *Vaughn v. Drennon*, 202 S.W.3d 308, 314 (Tex. App.—Tyler 2006, no pet.). The record must also contain evidence supporting each injunctive provision. *Operation Rescue*, 975 S.W.2d at 560.

The Hayeses' live pleading at time of trial requested "injunctive relief requiring Defendants to remove the Sports Court, and all of its lighting, fencing, and planters that are within the twenty-foot setback." The petition thus sought only the complete removal of everything on the back twenty feet of the Torreses' property, which would include seventeen feet of the sports court, all fencing on the court, all of the planters, and four of the light poles. The petition also included a general prayer for equitable relief to which the Hayeses were entitled under the pleadings and evidence. After the jury's verdict, the Hayeses filed their motion to enter judgment, which included a request for the trial court to render the injunctive relief outlined in their proposed final judgment. The only relief the Hayeses then requested was for an injunction requiring the Torreses

---

[8] The Torreses also argue the award of injunctive relief in addition to the award for loss of market value caused by the nuisance is an impermissible double recovery. Because we reverse and render the damage award, we do not reach this issue.

to reduce the number of lights to eight, to change the angle at which the bulbs and housings are mounted, and to install ten-inch shields on each of the lights. At the hearing on the motion to enter, the Hayeses' attorney further expressly told the court:

> We're not asking for anything with regards to the fence, the planters. We don't want to split costs with them on anything. All we're asking for is the judge enter an injunction that they have to have the lights - - one light at 90 degrees, as set forth in [the proposed judgment], and that's all we want.

Nevertheless, the trial court enjoined the parties to build and split the cost of two fences. The Hayeses did not request this relief in either its petition or in its post-verdict pleadings, and affirmatively disclaimed any request for fencing at the hearing on the motion for judgment. And, although the Hayeses' live petition prayed for removal of all the planters within twenty feet of the property line, the Hayeses expressly abandoned that request in their post-judgment pleadings and arguments. Because paragraphs (1), (2), and (3) of the injunction, requiring the parties to build a privacy fence and a sports court fence and remove some of the planters, are not supported by the pleadings, these paragraphs of the injunction amount to an abuse of discretion. *See Holubec*, 111 S.W.3d at 39; *Hall*, 2011 WL 61631, at *5-6.

The Torreses also argue the Hayeses are not entitled to the relief in paragraph (4) of the injunction, requiring the Torreses to shield the lights and install banners, because the petition pleaded only for complete removal of the lights and there is no evidence to support the relief. The gist of the allegations in the petition was that the sports court, including the lighting, constituted a nuisance, and the Hayeses sought abatement of the nuisance. Although the petition specifically sought complete removal of the lights, it also included a prayer for general relief. There was evidence at trial that steps could be taken to shield the light source and to reduce the amount of light spillage onto the Hayeses' property, thus at least partially abating the nuisance. Further, in their post-verdict pleadings the Hayeses expressly requested shielding of the light. This part of

the injunction is therefore supported by both the pleadings and the evidence. *See Vaughn*, 202 S.W.3d at 314, 316.

Paragraph (5) of the injunction prohibits the Torreses from playing tennis or using the lights before 7:00 a.m. and after 7:00 p.m. on weekdays and 9:00 p.m. on weekends during Central Standard time, and after 9:00 p.m. on weekdays and 10:00 p.m. on weekends during Daylight Savings time. The Torreses contend these restrictions unreasonably enjoin their lawful use of their property and are not supported by the pleadings or the evidence.

The record does not contain any evidence that the Torreses' use of the court to play tennis (without the lights) caused or threatened to cause any substantial and unreasonable interference with the Hayeses' use and enjoyment of their property. The Hayeses state in their appellate brief that this provision in the injunction was to "minimize .. the noise … pollution for which the Hayeses sought relief." However, the only evidence of noise is a general statement by Mr. Hayes that the sports court "has generated light, noise, and other sorts of issues" and a statement by Mrs. Hayes that there is a "noise problem." Neither of the Hayeses elaborated on these statements and there is no evidence of any instance in which people using the court caused any unreasonable noise. The Hayeses did not present any evidence that use of the court without the lights at any time has caused substantial and unreasonable interference with an ordinary person's use and enjoyment of the property or caused any other harm that would be abated by restricting the times the Torreses may use their property. The evidence therefore does not support the restrictions on the Torreses use of the court without the lights.

The record does not contain any evidence that the Torreses have ever used the court lights in the early morning, and there is thus no evidentiary basis for the prohibition on using the lights before 7:00 a.m. With respect to use of the lights in the evenings and night time, the Torreses testified that in the year since the temporary injunction had been lifted, the latest they had used the

lights was 9:30 or 10:00 p.m. The Hayeses did not dispute the testimony. There is no evidence the Torreses have or intend to use the lights at unreasonably late hours. Moreover, paragraph (4) of the injunctive relief requires the Torreses to install shields and banners on the lights. The Hayeses' lighting consultant testified shielding would eliminate the visibility of the light source and would reduce the spillage of light onto the Hayeses' property. The lighting consultant testified that even with shielding, some spillage would remain because of the configuration of the lights; however, there was no evidence of how much spillage would remain after ten-inch shields and banners are installed and no evidence of whether the remaining spillage would be considered unreasonable to a person of ordinary sensibilities.

An injunction must not be so broad as to enjoin a defendant from activities that are a lawful and proper exercise of the defendant's rights. *Vaughn*, 202 S.W.3d at 313; *Computek & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 221 (Tex. App.—Dallas 2005, no pet.). "[I]njunctive relief is improper where the party seeking the injunction has mere fear or apprehension of the possibility of injury." *Vaughn*, 202 S.W.3d at 313; *see Holubec*, 214 S.W.3d at 657 (stating that an "injunction will be granted only to restrain actually existing nuisances, and not to restrain an intended act on the ground that it may become a nuisance"). In the absence of evidence that the shielded lights would continue to be a nuisance, restrictions on the hours the Torreses may use the lights is not warranted and is an impermissible infringement on the Torreses' lawful use of their property. Paragraph (5) of the injunction, prohibiting the Torreses from playing tennis and from turning on shielded lights during certain hours, is not based on proof of actual or threatened injury and is therefore an abuse of discretion. *See Holubec*, 214 S.W.3d at 657-58; *Vaughn*, 202 S.W.3d at 318-19.

*Is relief clear and precise?*

A permanent injunction must be narrowly drawn and precise. *Schneider*, 147 S.W.3d at 287. It "must be as definite, clear and precise as possible, . . . without calling on [defendant] for inferences or conclusions about which persons might well differ and without leaving anything for further hearing." *Villalobos v. Holguin*, 146 Tex. 474, 480, 208 S.W.2d 871, 875 (1948). The order must be clear enough and "contain sufficient detail for the [defendants] to determine exactly what the court wants them to do." *Vaughn*, 202 S.W.3d at 317. The Torreses argue that paragraphs (1) (privacy fence), (2) (sports court fence), (3) (planters), and (4) (lights, shields and banners) are insufficiently clear and precise. Because we have held that paragraphs (1), (2), and (3) are not supported by the pleadings, we address only the injunctive relief regarding the lights. Paragraph (4) of the injunctive relief in the judgment states:

> Defendants shall shield the sixteen (16) lights currently in place on the tennis court and the lights will remain in the current positions, angles and number (16). Each light immediately adjacent to Plaintiffs'' property shall be shielded on three sides with ten (10) inch shields extending from the bottom of the light fixture. Each light that is on the opposite side of the tennis court from Plaintiffs' side of the property shall have two shields, (1) ten-inch front light shield and one (1) ten-inch shield on the angled side facing Plaintiffs' property; these 10-inch shields shall also extend from the bottom of the light fixture. Defendants shall install black-out banners on the four (4) light poles on the court lights adjacent to Plaintiffs' Property which shall cover both lights on the top of the pole and shall be lowered when not in use. Same shall be installed within sixty (60) days of entry of this judgment.

The Torreses first assert that it is unclear whether the Torreses are prohibited from removing any of the lights. In light of the record in this case, we agree the judgment is ambiguous as to whether the statement "the lights will remain in the current positions, angles and number (16)" is a directive prohibiting the Torreses from removing any of the light fixtures or changing their angles or whether it simply reflects the trial court's ruling that the Torreses are not required to remove any

of the lights, as the Hayeses had requested. We therefore reverse this portion of the injunctive relief and order the trial court to clarify this portion of the relief on remand.[9]

The Torreses also complain that the injunction does not specify which three sides of the light fixtures on the side of the court adjacent to the Hayeses' property must be shielded and that the injunction to install "black-out banners" that "cover both lights on the top of the pole" and to "lower[] [them] when not in use" fails to inform the Torreses of "exactly what the court wants them to do." *See id.* We agree that the language of the judgment requires the parties to infer which three sides of those lights must be shielded and to speculate as to what is meant by "black-out banner," a phrase not used by any of the witnesses at trial, what the length and width the banners must be, and what the court intends by "cover both lights" (must the banners be placed behind the lights or cover the tops of the fixtures?). We presume the court intended that the banners are to be lowered when *the lights* are not in use, however, the trial court should clarify this on remand. We therefore reverse paragraph (4) of the injunctive relief and remand for the trial court to reform this part of the injunctive relief so that it is narrowly drawn and precise, and it is clear to the parties what must be done in order to comply.

### *Does relief improperly extend to nonparties?*

The Torreses complain that paragraph (6) of injunctive relief impermissibly inures to the benefit of the Hayeses' successors and assigns and binds the successors and assigns of the Torreses' property.

---

[9] We note that even if the trial court specifically enjoins the Torreses from removing or changing the angle of any of the fixtures, nothing in the judgment precludes the Torreses from removing the bulbs from some of the fixtures. Further, nothing prevents the parties from reaching an agreement to reduce the number of or change the configuration of the lights and then petitioning the court to vacate or modify the injunction based upon changed circumstances. *See Smith v. O'Neill*, 813 S.W.2d 501, 502 (Tex. 1991) (per curiam).

It is well settled that injunctions act *in personam* and not *in rem*. *Ex parte Davis*, 470 S.W.2d 647, 649 (Tex. 1971) (per curiam, orig. proceeding); *Greenpeace, Inc. v. Exxon Mobil Corp.*, 133 S.W.3d 804, 809 (Tex. App.—Dallas 2004, pet. denied). "The fact that an equitable decree will indirectly affect title to or an interest in land does not preclude the characterization of the action as one in personam, where the remedy will be enforced against the person." *Greenpeace,* 133 S.W.3d at 809.

The private nuisance proven by the Hayeses is an injury to their right to use and enjoy their property. *See Crosstex*, 505 S.W.3d at 594. The injury is personal to them, but the effect of the challenged language is to render the injunctive relief an *in rem* remedy, akin to a restrictive covenant, that runs with the land and benefits subsequent possessors of the Hayes property, even though they were not parties to the litigation and have not been injured. We hold the injunctive remedy does not properly inure to the benefit of subsequent possessors of the Hayeses' property. *See Hot Rod Hill Motor Park v. Triolo*, 293 S.W.3d 788, 789-90 (Tex. App.—Waco 2009, pet. denied) (holding trial court should have vacated permanent injunction prohibiting operation of race track after person who obtained injunction in nuisance action sold his home and no longer possessed neighboring property).

Because an injunction acts *in personam*, it is effective and enforceable only against parties to the proceeding, their agents, and those acting in active concert or participation with them. *Davis*, 470 S.W.2d at 648-49 (holding subsequent owner of real property could not be held in contempt for violating injunction restricting use of property). And an injunction that is worded to include "successors and assigns" would not be effective as to non-party successors whose only relationship with the party enjoined is of grantor-grantee because it effectively enlarges the allowed scope of an injunction. *See id.* at 649 (citing FED. R. CIV. P. 65(d) and *Regal Knitwear Co. v. Nat'l Labor Relations Bd.*, 324 U.S. 9, 14 (1944)).

Rule 683 of the Texas Rules of Civil Procedure provides in part:

> Every order granting an injunction . . . is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

TEX. R. CIV. P. 683. "The requirements of Rule 683 are mandatory and must be strictly followed." *InterFirst Bank San Felipe, N.A. v. Paz Const. Co.*, 715 S.W.2d 640, 641 (Tex. 1986) (per curiam). An injunction purporting to bind persons other than those listed in the rule is impermissibly overbroad. *See RCI Entm't (San Antonio), Inc. v. City of San Antonio*, 373 S.W.3d 589, 604-05 (Tex. App.—San Antonio 2012, no pet.) (holding injunction that bound defendant's "representatives and contractors" was too broad in scope because those persons are not listed in Rule 683); *Metra United Escalante, L.P. v. Lynd Co.*, 158 S.W.3d 535, 544 (Tex. App.—San Antonio 2004, no pet.) (holding part of injunction that enjoined successors and assigns of property owners was overbroad). A subsequent grantee of property may be bound by an injunction only if "in active concert or participation" with the named party; however, that occurs only if there is some evidence he participated in the original proceeding and was a real party in interest when the decree was rendered or some evidence of involvement with the named enjoined party. *Davis*, 470 S.W.2d at 649.

The Hayeses respond to the Torreses' arguments by asserting that Texas Rule of Procedure 683 does not apply to permanent injunctions. We disagree. Rule 683 is entitled "Form and Scope of Injunction or Restraining Order." The first paragraph of the rule applies to "[e]very order granting an injunction and every restraining order" and includes the limitation on the scope of an injunction. The second paragraph of the rule applies to "[e]very order granting a temporary injunction." The plain language of the rule applies the scope limitations to *all* injunctions, and both the Texas Supreme Court and this court have applied the scope provision of Rule 683 to

permanent injunctions. *See Ex parte Browne*, 543 S.W.2d 82, 84-85 (Tex. 1976) (orig. proceeding) (applying Rule 683 to hold that party's attorney was bound by injunction and could be held in contempt for violating it); *RCI*, 373 S.W.3d at 604-05 (holding inclusion of "representatives and contractors" within scope of permanent injunction rendered it overly broad); *see also Hitt v. Mabry*, 687 S.W.2d 791, 795 (Tex. App.—San Antonio 1985, no writ) (noting applicability of Rule 683 scope provision to the permanent injunction in issue). We decline to hold otherwise.[10]

The Hayeses also argue the Torreses waived this complaint by failing to object in the trial court. We again disagree. The Torreses filed a written objection to the language in paragraph (6) of the original judgment that stated the "judgment shall inure to the benefit of the successors and assigns of the Hayes' property and shall run with the Defendants' property." The Torreses asked the court to remove paragraph (6) in its entirety, arguing in part that the provision effectively imposed a restrictive covenant on the property and impermissibly bound subsequent owners of the Torres property. The court's amended judgment simply changed the phrase "run with the Defendant's property" to "shall be binding against the successors and assigns of Defendants' property," without changing the meaning or effect of the paragraph. We hold the Torreses preserved their complaint, if such preservation was necessary. *See EOG Res., Inc. v. Gutierrez*, 75 S.W.3d 50, 52-53 (Tex. App.—San Antonio 2002, no pet.) (holding that because requirements of Rule 683 are mandatory, failure to comply with Rule 683 is not waived by failing to raise

---

[10] Most of the Hayeses' authority on this issue are opinions that decline to apply the Rule 683 requirement that an injunction state the reasons for its issuance to a permanent injunction. *See Vaughn*, 202 S.W.3d at 321; *Shields v. State*, 27 S.W.3d 267, 273 (Tex. App.—Austin 2000, no pet.); *Spinuzzi v. Town of Corinth*, 665 S.W.2d 530, 534 (Tex. App.—Fort Worth 1983, no writ). However, some use broad language, asserting that "Rule 683 does not apply to permanent injunctions," *see, e.g.*, *Stephens v. City of Reno*, 342 S.W.3d 249, 254 (Tex. App.—Texarkana 2011, no pet.), and one opinion holds the Rule 683 limitations on the scope of injunctions does not apply to permanent injunctions. *See Qaddura v. Indo–European Foods, Inc.*, 141 S.W.3d 882, 892 (Tex. App.—Dallas 2004, pet. denied). For the reasons stated in the text, we do not agree with *Qaddura*. The Hayeses also point to this court's opinion in *Ghidoni v. Stone Oak, Inc.*, asserting that this court allowed an injunction that bound "successors and assigns" to stand. 966 S.W.2d 573, 583 (Tex. App.—San Antonio 1998, pet. denied). However, the "successors and assigns" language in the *Ghidoni* injunction was not challenged on appeal. *See id.*

complaint in trial court). We therefore hold that paragraph (6) is overly broad and its inclusion in the injunction was an abuse its discretion.

## CONCLUSION

The trial court's amended final judgment is affirmed in part, reversed and rendered in part, and reversed and remanded in part. We affirm the judgment that the Torreses take nothing on their claim for attorney's fees under the Texas Water Code. We affirm the trial court's awards to the Hayeses of $5,000 on their trespass claim and of $1,925 on their negligence claim. We hold that legally sufficient evidence supports the jury's findings that the Torreses negligently created a nuisance and that those findings support an award of injunctive relief. However, we reverse the award of $25,000 for loss of market value caused by the nuisance because no evidence supports the award, and we render judgment that the Hayeses take nothing. We reverse all of the injunctive relief and render judgment dissolving paragraphs (1), (2), (3), (5), and (6) of the injunction. We remand the case for the trial court to reconsider paragraph (4) of the injunctive relief and to redraft it so that it is clear and precise. Specifically, the redrafted relief should clarify whether the Torreses may remove or change the configuration or angles of any of the light fixtures, specify which three sides of the lights on the court adjacent to the Hayeses' property must be shielded, clarify what is meant by "blackout banner," specify the length and width of the required banners, specify where the tops of the banners must be located in relation to the tops of the light fixtures, and clarify when the banners must be taken down. The remainder of the amended final judgment, not challenged in this appeal, is affirmed.

Luz Elena D. Chapa, Justice